**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **PLANT RIVERSIDE, LLC and KESSLER** | ) | |
| **CONDO DECLARANT, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action** |
| | ) | |
| **v.** | ) | **File No. _____** |
| | ) | |
| **HUNT CONSTRUCTION GROUP, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

**COME NOW** Plaintiffs, Plant Riverside, LLC and Kessler Condo Declarant, LLC (referred to collectively herein as the "Owners"), and file this their Complaint against Defendant, Hunt Construction Group, Inc., and show as follows:

## I. NATURE OF THE ACTION

1.

Plaintiffs are the owners and developers of four separate projects within an upscale hotel, restaurant, retail and entertainment district along the Savannah River in Savannah, Georgia (the "Plant Riverside District Development").

2.

Defendant Hunt Construction Group, Inc. ("Hunt"), as the general contractor, and Plaintiffs, as owners, entered into four separate contracts to build the four projects within the Plant Riverside District Development.

3.

While construction of all four projects within the Plant Riverside District Development was originally scheduled to be completed in two years, over four years have passed since work

commenced in November 2016, and Hunt has still not completed all of the work. Even after receiving generous time extensions to the contract substantial completion dates, Hunt's gross mismanagement of the work has caused Hunt to be well over a year late in achieving substantial completion on each of the four projects (ranging from 398 days late on two of the contracts to an anticipated substantial completion that is over 550 days late on the other two contracts).

4.

In this action, Plaintiffs seek to recover from Hunt (i) substantial costs and damages incurred as a result of hundreds of days of delay, due to Hunt's gross mismanagement of the work; (ii) an additional amount in excess of several million dollars, which the Owner had advanced to Hunt under threat of abandonment to settle certain subcontractor claims for delays attributable to the Owner but which Hunt did not use to settle such claims; and (iii) an immediate declaration that liens Hunt has filed against the Owners' properties are invalid, and should be dissolved and or released giving effect to the representations Hunt made in its statutory waiver and releases acknowledging the Owners' payments in full, and waiving and releasing the claims Hunt later asserted in its lien claims.

## II. JURISDICTION AND VENUE

5.

Plaintiff, Plant Riverside, LLC ("PRD"), is a limited liability company organized under the laws of the state of Delaware and having its principle place of business in Orlando, Florida. PRD has no member that is a citizen of the State of Georgia or Indiana.

6.

Plaintiff, Kessler Condo Declarant, LLC ("KCD") is a limited liability company organized under the laws of the state of Delaware and having its principle place of business in Orlando, Florida. KCD has no member that is a citizen of the State of Georgia or Indiana.

2

7.

Defendant, Hunt, is a corporation organized under Indiana law and having its principal place of business in Indiana.

8.

The Summons and Complaint may be served on Hunt *via* its registered agent, C T Corporation System, 289 South Culver Street, Lawrenceville, Georgia, 30046-4805.

9.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy, exclusive of interest and costs, exceeds $75,000.00, and the parties to this action are citizens of different states.

10.

This Court is an appropriate venue for this action pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District.

11.

As a corporation registered to do business in Georgia, Hunt is subject to the Court's personal jurisdiction with respect to this action.

### III.  THE CONTRACTS AND COMPLETION DEADLINES AT ISSUE

12.

Hunt agreed to timely construct the Projects within the Plant Riverside District Development under four individual and separately priced contracts for (i) the Historic Building Project; (ii) the Three Muses Project, (iii) the West Hotel Project, and (iv) the Parking Garage Project. The contracts for these projects are described below.

3

## The Historic Building Contract

13.

Plaintiff, PRD, is the Owner with whom Hunt contracted to build the Historic Building Project described below under a guaranteed maximum price contract (the "Historic Building Contract").

14.

The Historic Building Project included the adaptive reuse of the historic Plant Riverside power plant, renovating and transforming the historic structure into a luxury hotel with 163 luxury guestrooms and amenities, including two restaurants, a rooftop lounge called the Electric Moon, a large mall area with kiosks and natural science exhibits, and an underground tunnel connecting it to the West Hotel to the west and the Three Muses to the east.

15.

Under the Historic Building Contract, Hunt agreed to build the Historic Building Project within the contractually specified time period and for a guaranteed maximum price, as adjusted from time to time via Owner issued change orders.

## The Three Muses Contract

16.

Plaintiff, PRD, is the Owner with whom Hunt contracted to build the Three Muses Project described below under a guaranteed maximum price contract (the "Three Muses Contract").

17.

The Three Muses Project involved the construction of three new connected hotel buildings immediately to the east of the Historic Building, with 141 luxury guestrooms, a roof top bar and patio, as well as surrounding site work with pavilions, kiosks and other amenities.

18.

Under the Three Muses Contract, Hunt agreed to build the Three Muses Project within the contractually specified time period and for a guaranteed maximum price, as adjusted from time to time via Owner issued change orders.

**The West Hotel Contract**

19.

Plaintiff, KCD, is the leasehold Owner with whom Hunt contracted to build the West Hotel Project described below under a guaranteed maximum price contract (the "West Hotel Contract").

20.

The West Hotel Project involved the construction of a new luxury hotel to the west of the Historic Building with 115 nautically themed guestroom suites, a ballroom, pre-function space, a music venue, as well as a rooftop pool and bar.

21.

Under the West Hotel Contract, Hunt agreed to build the West Hotel Project within the contractually specified time period and for a guaranteed maximum price, as adjusted from time to time via Owner issued change orders.

**The Parking Garage Contract**

22.

Plaintiff, KCD, is the leasehold Owner with whom Hunt contracted to build the Parking Garage Project described below under a guaranteed maximum price contract (the "Parking Garage Contract").

4833-5766-2966 v1

23.

The Parking Garage Project involved the construction of a 488-space parking deck within the West Hotel, including 4 underground levels and 4 above ground levels that are wrapped by the West Hotel's 115 hotel rooms.

24.

Under the Parking Garage Contract, Hunt agreed to build the Parking Garage Project within the contractually specified time period and for a guaranteed maximum price, as adjusted from time to time via Owner issued change orders.

## IV.  HUNT'S GROSS MISMANAGEMENT OF THE WORK

25.

The Historic Building Contract, Three Muses Contract, West Hotel Contract and Parking Garage Contract are referred to collectively herein as the "Four Contracts."

26.

Under each of the Four Contracts, Hunt agreed that it "shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time." [See AIA A201, § 8.2.3].

27.

Under each of the Four Contracts, Hunt initially agreed to achieve substantial completion of each contract within 729 days of the commencement of the work.

28.

In a change order issued under the Historic Building Contract, Hunt's deadline for achieving substantial completion of the Historic Building Project was extended 174 days from November 19, 2018 to May 18, 2019.

6

29.

In a change order issued under the Three Muses Contract, Hunt's deadline for achieving substantial completion of the Three Muses Project was extended 174 days from November 19, 2018 to May 18, 2019.

30.

In change orders issued under the West Hotel Contract, Hunt's deadline for achieving substantial completion of the West Hotel Project was extended 413 days from November 19, 2018 to January 6, 2020.

31.

In change orders issued under the Parking Garage Contract, Hunt's deadline for substantial completion of the Parking Garage Project was extended 413 days from November 19, 2018 to January 6, 2020.

32.

Even after receiving the generous time extensions under each of the Four Contracts described above, Hunt woefully failed to achieve substantial completion of construction within the amended contractual deadlines on all four projects, due to its gross mismanagement of the projects, as described in more detail below.

33.

Hunt did not achieve substantial completion on the Historic Building Project until June 19, 2020, which was 398 days after its extended deadline for substantial completion under the Historic Building Contract, and Hunt still has not fully completed all of its work on the Historic Building Project or its obligations under the Historic Building Contract.

34.

Hunt did not achieve substantial completion on the Three Muses Project until June 19, 2020, which was also 398 days after its extended deadline for substantial completion under the Three Muses Contract, and Hunt still has not fully completed all of its work on the Three Muses Project or its obligations under the Three Muses Contract.

35.

Despite having had its deadline extended by 413 days, Hunt still has not achieved substantial completion of the West Hotel Project; when it finally achieves substantial completion, Hunt will be over 550 days late under its extended contractual deadline of January 6, 2020.

36.

Despite also having had its deadline extended by 413 days under the Parking Garage Contract, Hunt has still not achieved substantial completion of the Parking Garage Project; when it finally achieves substantial completion, Hunt will be over 550 days late under its extended contractual deadline of January 6, 2020.

37.

The Owners have incurred significant losses as a result of Hunt's gross failure to manage the various Projects to achieve substantial completion within the time required under the contracts (as extended by change orders).

38.

Hunt's gross failure to manage the projects and otherwise achieve substantial completion of the respective projects was caused individually, and cumulatively, by its reckless indifference to its commitments to each of the Plaintiffs under the respective contracts.

8

A.     **Hunt's Gross Negligence and Complete Indifference to Water Management at the West Hotel and Parking Garage**

39.

Hunt's grossly inadequate water management in the mass excavation for the West Hotel and Parking Garage (the "Mass Excavation") exemplified Hunt's gross negligence, utter indifference and recklessness.

40.

Hunt's contractual responsibilities under the West Hotel and Parking Garage Contracts included the management and diversion of storm water so that surface water did not result in construction delays.

41.

For more than two years Hunt's recklessness, indifference, and gross negligence in failing to perform surface water management and dewatering resulted in surface water pouring into and remaining in the Mass Excavation, stalling construction work in the Mass Excavation, and delaying the West Hotel and Garage Projects.

42.

Instead of diverting surface water, Hunt allowed the large hole created by the Mass Excavation to, in effect, become a large retention pond that would fill with surface water after each rain, resulting in significant delays to the West Hotel and Parking Garage Projects.

43.

Hunt's initial and continuing failure to divert surface water allowed water to pond in the Mass Excavation, preventing work from proceeding in the Mass Excavation and substantially delaying the completion of the West Hotel and Parking Garage projects.

44.

In addition to the delays caused by Hunt's recklessly indifferent and grossly negligent failure to divert surface water from flowing into the Mass Excavation, Hunt's failure to design and employ an adequate dewatering system to extract water from the Mass Excavation made the situation even worse.

45.

Hunt was contractually required to design and install a dewatering system as needed to extract water from the Mass Excavation during construction.

46.

The dewatering system that Hunt designed and attempted to rely on was grossly inadequate, ineffective and failed to conform to the contract requirements.

47.

Delays caused by Hunt's gross failure to divert surface water from flowing into the Mass Excavation were exacerbated by Hunt's failure to design and employ an adequate dewatering system to extract water from the Mass Excavation.

48.

Despite the obvious inadequacy of Hunt's surface water management and dewatering in the Mass Excavation, Hunt needlessly delayed correcting the problem for a period in excess of two years.

49.

As a result of Hunt's needless delays in addressing the water problem it created in the Mass Excavation, the completion of Hunt's work on the West Hotel and Parking Garage projects was needlessly and extensively delayed.

## B.     Hunt's Gross Failure to Manage Structural Steel Work

50.

Another example of Hunt's indifference and gross negligence was its complete failure to coordinate and manage structural steel work.

51.

Because the Historic Building Project involved the adaptive reuse of the historic Plant Riverside power plant, newly constructed structural elements had to tie into portions of the existing structural steel.

52.

Hunt had a contractual duty to initially inspect the existing Historic Building structure and to create as-built drawings of the existing steel conditions so that newly manufactured steel could be fabricated to correctly connect to the existing steel.

53.

Hunt failed to adequately expose and investigate the existing steel so that the dimensions could be measured and connections with the new steel could be appropriately designed using as-built drawings.

54.

Hunt had its steel fabricator attempt to prepare shop drawings for steel connections without knowing the actual as-built conditions of the existing steel.

55.

As a result, Hunt ordered steel for the job based on shop drawings which were not based on the actual as-built conditions of the existing structural steel. When the fabricated steel arrived, predictably, the newly fabricated steel did not connect properly to the existing steel.

11

56.

The erection of the structural steel at the Historic Building was substantially delayed because non-fitting steel connections had to be redesigned, re-fabricated and re-shipped to the project after the existing steel conditions were exposed by demolition.

57.

As a result of Hunt's recklessly indifferent and grossly negligent failure to manage the structural steel work, the Historic Building Project was significantly delayed.

**C.     The Extraordinary Amount of Defective, Incomplete or Deficient Work**

58.

In addition, Hunt's work on the four projects included a substantial amount of defective, deficient, non-conforming or incomplete items, reflecting a pervasive lack of oversite and management of the work by Hunt.

59.

When Hunt began to conduct inspections of the guest rooms in the Historic Building and Three Muses Projects, the inspections revealed an alarming 18,220 items of defective, deficient, non-conforming, incomplete or entirely missing work.  Thereafter, the list grew to 19,509 items, resulting in extensive delays in achieving substantial completion of these projects.

60.

The list of deficient and incomplete work had become so extensive on the Historic Building/Three Muses Projects that Hunt's punch out work on the Three Muses took over four times longer than planned under Hunt's baseline schedule, and was still not completed by the July, 2020 opening of the Three Muses Hotel. As of the Opening Day of the Historic Building and Three Muses in July 2020, more than 1,080 items on the list of deficient work still remained to be completed.

12

61.

The shockingly large amount of deficient work is a direct result of Hunt's reckless, indifferent and grossly negligent failure to supervise and manage the work of its subcontractors.

**D.      Hunt's Persistent Failure to Engage the Required Number of Workers**

62.

Although each of the Four Contracts required that Hunt engage a sufficient number of workers to achieve substantial completion within the contract time, Hunt persistently failed to engage adequate forces on all of these projects.

63.

As a large and sophisticated general contractor, Hunt was aware that, in order to timely complete each activity within their planned durations under the contract schedule, Hunt needed to engage hundreds of more workers than it did.

64.

Because Hunt failed and/or refused to hire enough workers, each individual item of work took significantly longer to complete when compared to its planned duration under the project schedules.

65.

Despite the obvious insufficiency of its subcontracted work force, Hunt allowed the situation to worsen.

66.

Due to its failure to provide an adequate work force, Hunt diverted almost all its subcontracted labor from the Three Muses Project for 5 months and directed them to instead work only on the Historic Building Project. Hunt's virtual abandonment of the Three Muses project during this time caused work on the Three Muses Project to come to a standstill.

13

## V. <u>Hunt's Invalid Lien Filings</u>

67.

On April 12, 2021, Hunt filed two invalid claims of lien against Owner's properties which continue to evidence its indifference to the Owners' rights.

68.

Hunt recorded a mechanic's lien claiming over $8 Million for amounts it alleges became due on January 22, 2021, under the Three Muses Contract.  This claim of lien was recorded against the Three Muses Project property, as well as against the West Hotel Project property and Garage Project property (the "Three Muses Lien").

69.

Hunt also recorded a mechanic's lien claiming over $12 Million for amounts it alleges became due on February 12, 2021, under the Historic Building Contract.  This claim of lien (the "Historic Building Lien") was recorded against the West Hotel Property and the Three Muses Property (the Three Muses Lien and the Historic Building Lien are referred to collectively as the "Liens").

70.

As an initial matter, Hunt has both waived and released its lien rights, and any rights to assert the underlying claims included in its Liens.

71.

For over four years, and on each of the Projects at issue, Hunt has certified and submitted valid signed lien waivers to the Owners using the Georgia statutory form, providing lawful protection to Owners and their lenders against spurious claims of lien like Hunt's Liens.

4833-5766-2966 v1

72.

Those waivers and releases Hunt executed are fully enforceable to prevent Hunt from later recording liens or otherwise asserting claims that have been previously waived and released. See e.g., *ALA Construction Services, LLC v. Controlled Access, Inc.*, 833 S.E.2d 570, 572 (Ga. App. 2019) (Cert. Denied) (holding that lien waivers containing the statutory wording under O.C.G.A. § 44-14-366, contained in the waivers executed by Hunt in this case, "shall be binding against the claimant for all purposes.").

73.

Specifically, the Liens are invalid since, among other reasons, the claims for payment purportedly due, that are asserted in Hunt's Liens, have been waived and released by Hunt in the numerous releases and waivers of liens and claims that Hunt executed and submitted to the Owners.

74.

Months after opening of the Historic Building Project, Hunt submitted such a statutory lien and claim waiver with its Payment Application No. 47, certifying that, upon Hunt's receipt of $349,920.60, it had been paid in full for the Historic Building Project for the period through November 20, 2020, with the sole exception of its retainage.  Hunt's statutory Interim Waiver and Release Upon Payment, dated December 16, 2020, is attached as **Exhibit 1.**

75.

Hunt has previously and subsequently executed and submitted additional statutory lien and claim waivers for the Historic Building Project in which it waived and released the claims asserted in Hunt's Liens.

76.

Hunt's claim that it is still owed $12,221,566 for work performed under the Historic Building Contract, and its Historic Building Lien claiming such amount, are both plainly false, as reflected in the representations Hunt made in the valid waivers and releases that Hunt executed prior to filing its invalid Liens.

77.

Months after opening of the Three Muses Hotel, Hunt submitted one of its many statutory lien and claim waivers for the Three Muses Project with its Payment Application No. 47, certifying that upon the receipt of $295,657.78 it had been paid in full for the Three Muses Project, for the period through November 20, 2020, with the exception of its retainage.  Hunt's statutory Interim Waiver and Release Upon Payment, dated December 16, 2020, is attached as **Exhibit 2.**

78.

Hunt has previously and subsequently executed and submitted additional statutory lien and claim waivers for the Three Muses Project in which it also waived and released the claims asserted in Hunt's Liens.

79.

Hunt's representation in the Three Muses Lien, claiming that it is owed $8,221,566 for work performed under the Three Muses Contract, is plainly false.

80.

In addition to the fact that the Liens were for false claims that Hunt had plainly released, Hunt's Liens are also invalid because the Liens were filed before Hunt has completed its work under the Historic Building and Three Muses Contracts, a statutory requirement for recording a valid lien under O.C.G.A. § 44-14-36.1 (a) (2). See e.g., *Seaboard Constr. Co. v. The Weitz*

16

*Company, LLC*, 2009 WL 3855185, \*5-6 (S.D. Ga. 2009) *citing Tri-City Constr. Co. v. Sandy Plains P'ship*, 426 S.E.2d 57, 58 (Ga. App. 1992).

81.

Hunt's Liens are also invalid for additional reasons including, but not limited to, the following: (i) Hunt failed to include in the Liens the specific subordination language that it agreed to include under the Consent and Subordination agreement it signed on November 22, 2016; and (ii) the liens are excessive and exceed the contract price limitation.

82.

Rather than PRD owing payment to Hunt under the Historic Building Contract or the Three Muses Contract, it is Hunt that owes PRD under these Contracts as detailed above. Hunt badly mismanaged its work on all four Projects and has caused Owners to incur millions of dollars in damages for which Hunt is liable to the Owners.

83.

If Hunt's Liens are not released or otherwise cancelled of record by Order of this Court, Owners may be forced to incur substantial costs to bond off the invalid liens that have been needlessly and recklessly recorded by Hunt.

## VI.  COUNT ONE – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

84.

All of the allegations in each of the foregoing paragraphs of this Complaint are incorporated herein by reference as if fully set forth under this Count of the Complaint.

85.

In order to prevent the needless expenditure of any further cost litigating and bonding off these invalid Liens, and to give effect to the representations Hunt made in its statutory waiver and releases, acknowledging the Owners' payments in full, and waiving, releasing, and certifying

the absence of the claims at issue, Plaintiffs seek a declaration that any claims asserted by Hunt are invalid to the extent they seek payment for work performed on the Historic Building or Three Muses Projects through the dates referenced in its lien waivers and releases, and a corresponding order requiring Hunt to cancel the Hunt Liens of record accordingly.

86.

In the alternative, Plaintiffs seek a declaration that Hunt's Liens are otherwise invalid, null, and void for the other reasons stated above, and an order requiring Hunt to cancel the Hunt Liens of record accordingly.

87.

In accordance with Fed. R. Civ. P. 57, Plaintiffs request a speedy hearing related to Hunt's claims and resulting Liens as set forth in Count One

## VII.  COUNT TWO – BREACH OF CONTRACT

88.

All of the allegations in each of the foregoing paragraphs of this Complaint are incorporated herein by reference as if fully set forth under this Count of the Complaint.

89.

Hunt breached each of the Four Contracts by the above-described mismanagement of the projects; the above-described gross failure to timely complete the Four Contracts; the above-described gross failure to engage an adequate number of workers needed to complete the work; by allowing and causing the work to be performed incompletely, and with pervasive defects and without conforming to the contract documents as described above; by failing and refusing to return funds conditionally advanced; and by the above-described filing of invalid liens.

18

90.

As a direct and proximate result of Hunt's breaches of the Four Contracts, the Owners have incurred millions of dollars in losses, which continue to accrue.

91.

The Owners have fully satisfied all conditions precedent to the assertion of these claims for breach of the Four Contracts.

92.

The Owners are entitled to a judgment against Hunt for the full amount of all damages the Owners have sustained, and continue to sustain, as a result of Hunt's breaches of the Four Contracts, which currently exceed $22,000,000.00

## VIII.  COUNT THREE – ATTORNEYS FEES AND COSTS

93.

All of the allegations in each of the foregoing paragraphs of this Complaint are incorporated herein by reference as if fully set forth under this Count of the Complaint.

94.

Each of the Four Contracts provide that "In any litigation or other legal proceeding which may arise between Owner and Contractor, the prevailing party shall be entitled to recover its litigation or mediation costs and reasonable attorneys' fees actually incurred." [AIA A102, § 15.9].

95.

The Owners are entitled to recover from Hunt all of their litigation or mediation costs and reasonable attorneys' fees actually incurred in pursuing their claims against Hunt, and in defending against Hunt's claims and Liens, as provided in the Four Contracts.

96.

Hunt is herein notified that the provisions contained in the Four Contracts relating to payment of attorney's fees and costs will be enforced; and that, to the extent that the Four Contracts constitute indebtedness under O.C.G.A. § 13-1-11, Hunt would be permitted, within ten (10) days from the date of service upon it of this Complaint, to make payment in full of all amounts owed Owners under the Four Contracts and to cancel both of its Liens at any time; and that, by such payment of said full claim amount and such cancelling its Liens within ten (10) days from the date of service upon it of this Complaint, thereby avoid any liability for attorney's fees and costs under the Four Contracts, to the extent they constitute indebtedness under O.C.G.A. § 13-1-11.

100.

In addition to its obligation to pay attorney's fees and costs of litigation under the terms of the Four Contracts, Owners are also entitled under O.C.G.A. § 13-6-11 to recover from Hunt all attorney's fees, legal expenses and all other costs of this action, since Hunt has acted in bad faith, has been stubbornly litigious, and has caused Owners unnecessary trouble and expense.

**WHEREFORE**, Plaintiffs respectfully pray that this Court award the following relief:

(a)     An award of money damages in an amount to be proven at trial on Counts Two and Three, which is not less than $22,000,000.00;

(b)     A declaratory judgment and order granting injunctive relief under Count One;

(c)     That all issues of fact be tried to a jury of 12 persons;

(d)     A speedy hearing, in accordance with Fed. R. Civ. P. 57, related to Hunt's claims and resulting Liens as set forth in Count One; and

(e)     Such other and further relief as the Court deems just and proper.

Respectfully submitted this 18th day of August, 2021.

HUNTER, MACLEAN, EXLEY & DUNN

By:    /s/  Christopher W. Phillips
      Christopher W. Phillips
      Georgia Bar No. 002920

200 E. Saint Julian Street
P.O. Box 9848
Savannah, GA 31412-0048
(912) 944-1652 direct phone
(912) 236-4936 fax
cphillips@huntermaclean.com

BRADLEY ARANT BOULT CUMMINGS LLP

By:    /s/  James Archibald
      James Archibald
      [applying for Pro Hac Vice status]
      D. Bryan Thomas
      [applying for Pro Hac Vice status]

One Federal Place
1819 5th Avenue N
Birmingham, AL 35203
(205) 521-8520 Archibald direct phone
(205) 488-6520 Archibald fax
jarchibald@bradley.com
(615) 252-2318 Thomas direct phone
(615) 252-6318 Thomas fax
dbthomas@bradley.com

WOMBLE BOND DICKINSON (US) LLP

By:    /s/  Joel G. Pieper
      Joel G. Pieper
      [applying for Pro Hac Vice status]
      Georgia Bar No. 478385

271 17th Street, N.W.
Suite 2400
Atlanta, GA  30363-1017
(404) 888-7435 direct phone
(404) 870-4831 direct fax
Joel.Pieper@wbd-us.com

**Attorneys for Plaintiffs**

4833-5766-2966 v1